UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SBA Telecommunications, LLC; SBA Sites, LLC; SBA Towers II LLC; SBA Towers, LLC; SBA Properties, LLC; SBA Towers V, LLC; SBA Towers VII, LLC; SBA Towers IV, LLC; SBA Towers VI, LLC; TV6 Holdings LLC; SBA Towers IX, LLC; SBA Structures, LLC; SBA Towers X, LLC; SBA Monarch Towers I, LLC; SBA Monarch Steel, LLC; SBA Monarch Towers III, LLC; SBA 2012 TC Assets, LLC; SBA Towers VIII, LLC; SBA GC Towers, LLC; SBA Infrastructure, LLC; SBA Towers III LLC; SBA Steel LLC; SBA Steel II, LLC; SBA Towers XI, LLC; and SBA BTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DISH Wireless L.L.C.,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiffs SBA Telecommunications, LLC; SBA Sites, LLC; SBA Towers II LLC; SBA Towers, LLC; SBA Properties, LLC; SBA Towers V, LLC; SBA Towers VII, LLC; SBA Towers IV, LLC; SBA Towers VI, LLC; TV6 Holdings LLC; SBA Towers IX, LLC; SBA Structures, LLC; SBA Towers X, LLC; SBA Monarch Towers I, LLC; SBA Monarch Steel, LLC; SBA Monarch Towers III, LLC; SBA 2012 TC Assets, LLC; SBA Towers VIII, LLC; SBA GC Towers, LLC; SBA Infrastructure, LLC; SBA Towers III LLC; SBA Steel LLC; SBA Steel II, LLC; SBA Towers XI, LLC; and SBA BTS, LLC (collectively with its affiliates, "SBA" or "Plaintiffs"), by and through its undersigned counsel, file this Complaint against Defendant DISH Wireless L.L.C. ("DISH") and allege as follows based on personal knowledge as to themselves and otherwise upon information or belief:

1

## **NATURE OF THE ACTION**

1.    SBA builds, owns and operates a portfolio of cell towers and other wireless communication infrastructure across the United States, including in western New York.  SBA enters into long-term leases with wireless carriers, including DISH, that allow carriers to install and operate equipment on SBA towers in exchange for monthly lease payments from the carriers.

2.    In July 2019, DISH obtained certain Federal Communications Commission ("FCC") spectrum licenses for purposes of building out a nationwide 5G network and becoming the fourth major wireless carrier in the U.S.

3.    In connection with DISH's 5G network buildout, beginning in 2021, DISH leased space on thousands of SBA towers.  The terms of SBA and DISH's arrangement are set forth in a master lease agreement between SBA and DISH, which was amended by the Parties for DISH's 5G buildout (collectively with the First Amendment, the "MLA").  The MLA set standardized pricing and established commitments for entering into thousands of new site-specific leases, each styled as a Supplement to Master Lease Agreement ("SLA").  This Complaint concerns ███ SLAs between SBA and DISH that are subject to the MLA.

4.    On December 31, 2023, EchoStar Corporation acquired DISH.

5.    Beginning as of December 1, 2025, DISH stopped paying SBA amounts due under the MLA and SLAs.  On January 27, 2026, following SBA's delivery of notices of default and DISH's failure to cure, SBA exercised its right to various default remedies under the MLA and SLAs, ███████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████ and, because DISH equipment continues to occupy and/or operate at certain SBA sites, damages are continuing to accrue.

6.     DISH's sole justification for default under the MLA and SLAs is a claim that performance was excused under both the frustration of purpose doctrine and the force majeure clause in the MLA because, in 2025, DISH's parent, EchoStar, made a business decision to abandon DISH's business plan to build-out a 5G network and instead sell DISH's FCC spectrum licenses to third-parties, AT&T and Space-X, in exchange for $40 billion.  These third-party sales, which remain subject to FCC consent, are poised to close at some point over the coming year. EchoStar and DISH's business decision to pursue this alternative strategy does not excuse DISH's obligations to SBA under the MLA and SLAs.

7.     By this action, SBA seeks recovery of monetary damages from DISH in accordance with the unambiguous terms of the MLA and SLAs ███████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████

## **PARTIES**

8.     Plaintiff SBA Telecommunications, LLC, a signatory to the MLA, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC is therefore a citizen of Florida.  At all relevant times, SBA Telecommunications, LLC was an independent owner and operator of wireless communications infrastructure.

9.      Plaintiff SBA Sites, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Sites, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.    SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Sites, LLC is therefore a citizen of Florida.  At all relevant times, SBA Sites, LLC was an independent owner and operator of wireless communications infrastructure.

10.     Plaintiff SBA Towers II LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Towers II LLC's sole member is SBA Towers, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Towers, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.    SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of

Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers II LLC is therefore a citizen of Florida. At all relevant times, SBA Towers II LLC was an independent owner and operator of wireless communications infrastructure.

11. Plaintiff SBA Towers, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Towers, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers, LLC was an independent owner and operator of wireless communications infrastructure.

12. Plaintiff SBA Properties, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Properties, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Guarantor's sole member is SBA Holdings LLC, a limited

liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Properties, LLC is therefore a citizen of Florida. At all relevant times, SBA Properties, LLC was an independent owner and operator of wireless communications infrastructure.

13.    Plaintiff SBA Towers V, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Towers V, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers V, LLC is therefore a citizen of Florida.

At all relevant times, SBA Towers V, LLC was an independent owner and operator of wireless communications infrastructure.

14.     Plaintiff SBA Towers VII, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Towers VII, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Towers VII, LLC is therefore a citizen of Florida.  At all relevant times, SBA Towers VII, LLC was an independent owner and operator of wireless communications infrastructure.

15.     Plaintiff SBA Towers IV, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Towers IV, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of

business in Boca Raton, Florida.  SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Towers IV, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers IV, LLC was an independent owner and operator of wireless communications infrastructure.

16.     Plaintiff SBA Towers VI, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Towers VI, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Towers VI, LLC is therefore a citizen of Florida.

At all relevant times, SBA Towers VI, LLC was an independent owner and operator of wireless communications infrastructure.

17.     Plaintiff TV6 Holdings LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  TV6 Holdings LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.   SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  TV6 Holdings LLC is therefore a citizen of Florida.  At all relevant times, TV6 Holdings LLC was an independent owner and operator of wireless communications infrastructure.

18.     Plaintiff SBA Towers IX, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Towers IX, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.   SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of

Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers IX, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers IX, LLC was an independent owner and operator of wireless communications infrastructure.

19.     Plaintiff SBA Structures, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Structures, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Structures, LLC is therefore a citizen of Florida. At all relevant times, SBA Structures, LLC was an independent owner and operator of wireless communications infrastructure.

20.     Plaintiff SBA Towers X, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Towers X, LLC's sole member is SBA Telecommunications, LLC, a

limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers X, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers X, LLC was an independent owner and operator of wireless communications infrastructure.

21.     Plaintiff SBA Monarch Towers I, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Monarch Towers I, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Monarch Towers I, LLC is therefore a citizen of Florida. At all relevant times, SBA Monarch Towers I, LLC was an independent owner and operator of wireless communications infrastructure.

22.     Plaintiff SBA Monarch Steel, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in

Boca Raton, Florida. SBA Monarch Steel, LLC's sole member is SBA TRS Holdco, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA TRS Holdco, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Monarch Steel, LLC is therefore a citizen of Florida. At all relevant times, SBA Monarch Steel, LLC was an independent owner and operator of wireless communications infrastructure.

23.     Plaintiff SBA Monarch Towers III, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Monarch Towers III, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws

of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Monarch Towers III, LLC is therefore a citizen of Florida.  At all relevant times, SBA Monarch Towers III, LLC was an independent owner and operator of wireless communications infrastructure.

24.    Plaintiff SBA 2012 TC Assets, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA 2012 TC Assets, LC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA 2012 TC Assets, LLC is therefore a citizen of Florida.  At all relevant times, SBA 2012 TC Assets, LLC was an independent owner and operator of wireless communications infrastructure.

25.    Plaintiff SBA Towers VIII, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Towers VIII, LLC's sole member is SBA Senior Finance II LLC, a

limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers VIII, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers VIII, LLC was an independent owner and operator of wireless communications infrastructure.

26. Plaintiff SBA GC Towers, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA GC Towers, LLC's sole member is SBA GC Holdings, LLC, a limited liability company organized under the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA GC Holdings, LLC's members are SBA GC Parent I, LLC and SBA GC Parent II, LLC. SBA GC Parent I, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA GC Parent II, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. The sole member of SBA GC Parent I, LLC and GC Parent II, LLC, respectively, is SBA Guarantor LLC. SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws

of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA GC Towers, LLC is therefore a citizen of Florida.  At all relevant times, SBA GC Towers, LLC was an independent owner and operator of wireless communications infrastructure.

27.    Plaintiff SBA Infrastructure, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Infrastructure, LLC's sole member is SBA Guarantor LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Guarantor's sole member is SBA Holdings LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida.  SBA Holdings LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Infrastructure, LLC is therefore a citizen of Florida. At all relevant times, SBA Infrastructure, LLC was an independent owner and operator of wireless communications infrastructure.

28.    Plaintiff SBA Towers III LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Towers III LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.   SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida.  SBA Towers III LLC is therefore a citizen of Florida. At all relevant times, SBA Towers III LLC was an independent owner and operator of wireless communications infrastructure.

29.    Plaintiff SBA Steel LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA Steel LLC's sole member is SBA TRS Holdco, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.  SBA TRS Holdco, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida.  SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.   SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of

16

Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Steel LLC is therefore a citizen of Florida. At all relevant times, SBA Steel LLC was an independent owner and operator of wireless communications infrastructure.

30.    Plaintiff SBA Steel II, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Steel II, LLC's sole member is SBA Towers IX, LLC, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Towers IX, LLC's sole member is SBA Senior Finance II LLC, a limited liability company organized under the laws of Forida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance II LLC's sole member is SBA Senior Finance, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Senior Finance LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Steel II, LLC is therefore a citizen of Florida. At all relevant times, SBA Steel II, LLC was an independent owner and operator of wireless communications infrastructure.

31.    Plaintiff SBA Towers XI, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Boca Raton, Florida. SBA Towers XI, LLC's sole member is SBA Telecommunications, LLC, a

limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA Towers XI, LLC is therefore a citizen of Florida. At all relevant times, SBA Towers XI, LLC was an independent owner and operator of wireless communications infrastructure.

32.     Plaintiff SBA BTS, LLC, a signatory to certain SLAs, is a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA BTS, LLC's sole member is SBA Telecommunications, LLC, a limited liability company organized under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida. SBA Telecommunications, LLC's sole member is SBA Communications Corporation, a Florida corporation with its principal place of business in Boca Raton, Florida. SBA BTS, LLC is therefore a citizen of Florida. At all relevant times, SBA BTS, LLC was an independent owner and operator of wireless communications infrastructure.

33.     Defendant DISH is a signatory to the MLA and the SLAs.[1] DISH is a limited liability company organized under the laws of the State of Colorado, with its principal place of business in Englewood, Colorado. DISH's sole member is Neyland Networks LLC. The sole member of Neyland Networks LLC is DISH Wireless Holding L.L.C. The sole member of DISH Wireless Holding L.L.C. is DISH Network Corporation. DISH Network Corporation is a Nevada corporation with its principal place of business located at 9601 South Meridian Boulevard,

---

[1] DISH entered into the original MLA through a DISH predecessor affiliate, Gamma Purchasing L.L.C.

Englewood, Colorado 80112.  DISH is therefore a citizen of Nevada and Colorado.  At all relevant times, DISH was a nationwide U.S. wireless carrier.

## JURISDICTION AND VENUE

34.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this is an action between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interests and costs.

35.     This Court has personal jurisdiction over Defendant DISH, and venue is proper pursuant to the terms of the MLA. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████      Section ██ states in full:

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

Ex. 1 - MLA § ██ (emphasis added).  Each SLA expressly incorporates by reference all of the

terms of the MLA ████████████████████████████████████

Ex. 2 - First Amendment, Ex. A § ██.  In addition, a number of the site-specific SLAs that DISH

breached and that are at issue in this action involve cell towers located within this District.

## FACTUAL ALLEGATIONS

### I.    The Wireless Market And DISH's 5G Network Buildout

36.    Delivering commercial wireless service requires extensive physical infrastructure, including cell towers that provide elevated mounting locations for antennas and radios, together with ground space for baseband units, and power systems.

37.    Independent tower companies, like SBA, construct, own and operate tens of thousands of tower sites nationwide, investing in site development, structural engineering, maintenance, and property management to ensure reliable, safe, and available facilities for wireless carriers.

38.    Wireless carriers often do not own their own towers.  Instead, they enter long-term lease agreements with independent tower companies like SBA allowing them to install and operate cellular equipment on the tower companies' towers.  These agreements set technical parameters, prescribe rent and fee structures, define equipment installation rights, and establish the ongoing operational responsibilities of each party under the arrangement.

39.    SBA is one of the largest independent owners and operators of wireless communications infrastructure, including towers, buildings, rooftops, distributed antenna systems, and small cells.  SBA operates more than 46,601 communications sites in thirteen markets throughout the Americas and South Africa.

40.    In 2019, DISH publicly announced its intention to enter the U.S. wireless market as a facilities-based carrier by building from the ground up a nationwide, first-of-its-kind 5G network, emphasizing a cloud-native, Open Radio Access Network architecture designed to fully leverage 5G functionality.  To support this initiative, DISH obtained a substantial portfolio of FCC wireless spectrum licenses and related assets.  At the same time, DISH publicly committed to the FCC to meet buildout milestones to commercialize those spectrum licenses on a nationwide basis so that DISH could compete against Verizon, AT&T and T-Mobile.

41.    DISH's business plan depended on swift and large-scale deployment.  DISH repeatedly acknowledged that achieving its objectives required broad geographic coverage and timely buildout to meet FCC requirements.  The FCC's 2019 construction milestones contemplated that DISH would deploy its 5G network using multiple spectrum bands to reach 75% of the U.S. population by June 14, 2025.  In furtherance of its plan, DISH acquired Boost Mobile from Sprint Corporation in July 2020 for approximately $1.4 billion.

42.    Thereafter, DISH continued to reiterate to investors and regulators that DISH was positioned to meet the FCC buildout obligations tied to its spectrum licenses and deliver competitive nationwide service.  DISH emphasized that the success of its 5G buildout depended upon extensive access to independent tower companies' infrastructure nationwide.  DISH's Executive Vice President of Network Development publicly stated that securing strong tower partners was "tremendously important" to the rapid roll-out of DISH's new, nationwide 5G network.[2]

---

[2] *DISH Expands Nationwide 5G Wireless Infrastructure with Seven New Tower Agreements* (Feb. 16, 2021), https://about.dish.com/2021-02-16-DISH-Expands-Nationwide-5G-Wireless-Infrastructure-with-Seven-New-Tower-Agreements.

## II.    SBA And DISH Execute The MLA And SLAs

43.    In February 2021, SBA and DISH executed an amendment (the "First Amendment") to an existing MLA, which had been entered into by a DISH predecessor affiliate, and various SLAs.    True and correct copies of the Master Lease Agreement and the First Amendment, which together comprise the "MLA," are attached as Exhibits 1 and 2, respectively. ███████████████████████████████████████████ *See* Ex. 2 - First Amendment ██████.

44.    Together, the MLA and the individual SLAs formed a comprehensive framework for SBA's provision of site access and related services to DISH on ███████ towers owned or operated by SBA across the country, including western New York, and DISH's reciprocal payment and performance obligations to SBA.

45.    Pursuant to the MLA, under each SLA, DISH would obtain access ████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████

46.    Over time, DISH and SBA entered into numerous SLAs covering individual towers across ████████████████████████.    This Complaint concerns █████ SLAs that are governed by the MLA.

47.    Pursuant to the MLA and the SLAs, SBA granted DISH a non-exclusive right to access towers ████████████████████████████████████████
████████████████████ *See, e.g.*, Ex. 1 - MLA §§ ████████████████████.    SBA was

also obligated to perform certain specified services ███████████████████████

█████████████████████████████████ *See, e.g.,* Ex. 1 - MLA §§ █████;

Ex. 2 - First Amendment § ██; *id.* at First Amendment, Addendum §§ ██.

      48.    The MLA and SLAs established, among other things, DISH's payment obligations

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

      49.    The First Amendment also provided DISH with certain defined and limited

termination rights. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ Specifically, the First Amendment provides:



Ex. 2 - First Amendment § ██ (amending MLA § █████) (emphasis added).

50. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Rather, in that scenario, the MLA and each SLA would remain in full force and effect.

51. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ A business

decision by DISH (or EchoStar) to abandon its prior business plan and instead sell DISH's

spectrum licenses to third parties is, ██████████████████████████ In

all events, this force majeure clause does not excuse DISH's performance of all remaining

obligations to SBA under the MLA or SLAs ██████████████████████

████████████████████

52. SBA performed all of its obligations under the MLA and the SLAs by providing

tower access and required services, processing applications, performing maintenance, and

otherwise meeting commitments in the ordinary course.

### III.   Following An FCC Inquiry, EchoStar Elects To Sell Spectrum Licenses To AT&T And SpaceX

53.    On December 31, 2023, EchoStar acquired DISH's parent company.[3]   On September 20, 2024, the FCC granted a request by EchoStar to extend DISH's 5G network buildout deadlines.  Pursuant to this approval, EchoStar's construction milestones for its AWS-4, lower 700 MHz E Block, 600 MHz, and AWS H Block spectrum licenses were extended until December 14, 2026, instead of the original deadline of June 14, 2025, and overall final construction milestones were extended to June 14, 2028, instead of December 14, 2026.  In exchange for the extension, EchoStar and DISH committed that DISH's open Radio Access Network would cover more than 80% of the U.S. population by the end of 2024, DISH would deploy 24,000 cellular towers by June 14, 2025, and offer an affordable nationwide 5G plan and device to consumers.

54.    In May 2025, the FCC initiated an inquiry into EchoStar's spectrum utilization.  On May 9, 2025, FCC Chairman Brendan Carr advised EchoStar that FCC staff had been directed to review EchoStar's compliance with its obligations to buildout and provide 5G service throughout the U.S. under the terms of its licenses.  EchoStar publicly responded that it had met or exceeded its buildout commitments to the FCC. In written submissions to the FCC dated May 27 and June 6, 2025, EchoStar asserted that any revocation or modification of its licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[4]  The inquiry's focus, as publicly described, concerned underutilization of certain EchoStar/DISH-held licenses and compliance with buildout

---

[3] In August 2023, DISH Network Corporation, DISH's parent company, announced a merger with EchoStar, which closed at the end of 2023.  References in this Complaint to EchoStar include DISH and DISH Network Corporation.

[4] Reply Comments of EchoStar Corporation, In the Matter of Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum, SB Docket No. 25-173 before the Federal Communications Commission.

and service obligations.  During the course of this inquiry, the FCC did *not* revoke the EchoStar/DISH-held licenses.

55.     By the end of Summer 2025, amid mounting pressure from creditors, EchoStar and DISH elected to abandon their plans to build a 5G network and instead sell their spectrum holdings to interested third parties.  On August 25, 2025, EchoStar and AT&T Mobility II LLC, a subsidiary of AT&T, Inc. ("AT&T") executed a License Purchase Agreement pursuant to which AT&T agreed to acquire from EchoStar spectrum licenses in the 600 MHz and 3.45 GHz bands, together with a 99-year extension of certain spectrum leases in Hawaii, for a cash purchase price of approximately $22.65 billion, subject to customary adjustments and conditions, including FCC consents.  The transaction contemplates the sale of approximately 20 MHz of 600 MHz spectrum and approximately 30 MHz of 3.45 GHz spectrum covering virtually all U.S. markets.

56.     EchoStar has stated that the AT&T spectrum sale is expected to close in the first half of 2026, subject to regulatory approvals, required FCC consents, and other customary closing conditions.  The agreement further provides for price adjustments if specific licenses are excluded prior to closing and establishes a minimum purchase price of $18.6 billion, with AT&T retaining an election to pay that minimum amount to satisfy the closing condition if otherwise triggered.

57.     On September 8, 2025, EchoStar and SpaceX announced a separate definitive agreement pursuant to which SpaceX would acquire from EchoStar/DISH certain spectrum licenses in exchange for approximately $17 billion, including $8.5 billion in cash and up to $8.5 billion in SpaceX equity, as well as an agreement by SpaceX to cover approximately $2 billion of interest payments due to EchoStar creditors through late 2027.  The SpaceX transaction, like the AT&T transaction, is subject to regulatory approval, including FCC consent, and is expected to close in 2026.  In November 2025, EchoStar and SpaceX amended the September agreement to

include an additional sale of spectrum licenses to SpaceX for an additional approximately $2.6 billion, covering EchoStar's unpaired AWS-3 licenses, also with closing contingent on regulatory approval.

58.      On September 8, 2025, following announcement of the SpaceX transaction, the FCC terminated its inquiry of DISH.  The FCC never completed its investigation relating to DISH or the spectrum licenses at issue.  The FCC did not make any findings or determinations relating to DISH or the spectrum licenses at issue.  The FCC did not issue any orders or decisions relating to DISH or the spectrum licenses at issue.  The FCC did not restrict DISH's use of any spectrum licenses or require the sale of any spectrum licenses.  No regulator revoked the spectrum licenses at issue or mandated any particular course of action with respect to those licenses.

59.      Rather, EchoStar, as DISH's parent, made a self-interested business decision to sell off its spectrum licenses in exchange for $40 billion.  This was based on its assessment of its current facts and circumstances, including the status of the FCC inquiry, the timeline for rolling out the 5G network, third-parties' stated interest in acquiring DISH's spectrum access, pressure from DISH and EchoStar's creditors and EchoStar's long-term strategic objectives.

60.      EchoStar has stated that it intends to use the $40 billion in third-party spectrum sale proceeds to, among other things, retire debt obligations, including obligations encumbering the transferred licenses, and to fund EchoStar's future growth.  Specifically, EchoStar CEO and President Hamid Akhavan said that "[t]he proceeds of this transaction will be used for, among other things, retiring certain debt obligations and funding EchoStar's continued operations and growth initiatives" and that EchoStar is continuing "to evaluate strategic opportunities for our remaining spectrum portfolio in partnership with the U.S. government and wireless industry

participants."[5]    The AT&T transaction requires repayment and redemption of specified EchoStar/DISH indebtedness at or prior to closing using sale proceeds, and delivery of the licenses free and clear of liens, as additional closing conditions.

61.    Notwithstanding these spectrum sale transactions, EchoStar and DISH have retained some spectrum assets, including but not limited to 700 MHz, AWS-3, and CBRS licenses with an aggregate value publicly reported to exceed $13 billion.  EchoStar has also publicly affirmed that DISH's Boost Mobile is continuing to operate and compete in the U.S. wireless market with a hybrid Mobile Virtual Network Operator ("MVNO")/Mobile Network Operator ("MNO") model that uses Boost Mobile's 5G core network as well as AT&T's and the T-Mobile network.  EchoStar's executives further stated that this hybrid model is expected to make Boost Mobile "way more competitive" and support ongoing growth.[6]

62.    In connection with its business decision to sell off spectrum licenses and move to a hybrid MVNO model, DISH has begun systematically reducing the size of DISH's Boost Mobile.  On August 28, 2025, DISH announced layoffs affecting roughly 500 employees, including members of its network deployment teams.

63.    In November 2025, EchoStar filed a Form 10-Q stating that following its spectrum sales to AT&T and SpaceX, it "began the abandonment and decommission process for certain portions of [the DISH] 5G Network."[7]

---

[5] EchoStar Corp., 8-K Report (Form 8-K) (Aug. 26, 2025).
[6] EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript), Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-on-pioneering-whats-next-echostars-vision-and-strategy-call-transcript.
[7] EchoStar Corp., Quarterly Report (Form 10-Q) (Nov. 6, 2025).

64.     The AT&T and SpaceX transactions were voluntary business decisions by EchoStar and its affiliates undertaken after the FCC initiated its inquiry and were expressly conditioned on regulatory approvals and other customary closing conditions.  The shift of Boost Mobile to a hybrid MVNO structure reflects discretionary business choices made exclusively by and thus within the control of EchoStar, DISH, and their affiliated entities.

65.     These transactions, EchoStar's continued retention of some spectrum licenses, and its public plans to continue operations as a hybrid MVNO/MNO do not excuse DISH's payment and performance obligations under the MLA and SLAs.  DISH's contractual commitments remain in full force notwithstanding EchoStar's strategic decision to pivot away from building a 5G network and instead sell off spectrum holdings.  ███████████████████████ ████████████████████████████████████ ████████████████████████████████ ██████████████████████████████ ██████████████████████████████ Ex. 2 - First Amendment § ██ (amending MLA § █████).  Accordingly, DISH does not have any right to terminate the MLA or any individual SLAs or otherwise avoid its contractual obligations following the negotiated transfers of spectrum licenses to AT&T or SpaceX.

## IV.     DISH Defaults Under The MLA And SLAs

66.     On September 24, 2025, DISH sent SBA a letter asserting that actions by the FCC and subsequent the AT&T and SpaceX spectrum license sales had "frustrated the principal purpose and completely destroyed the value of the [MLA] and DISH Wireless's ability to perform," and that, "[a]s a result, DISH Wireless's obligations [under the MLA and constituent SLAs] are excused."  According to DISH, the "FCC's actions and the resulting" AT&T and SpaceX sales

constituted a "force majeure event" and "frustrated the principal purpose" of the MLA and the SLAs. DISH vaguely stated that the FCC had initiated an investigation into "reversing prior grants of license authority," had "made clear" that EchoStar and its subsidiaries "needed to sell certain spectrum licenses or face a wide-ranging license revocation," and that EchoStar accordingly "entered into a series of transactions that will, over time, result in the decommissioning of our Boost Mobile radio access network." Hoping to shield spectrum sale process from tower companies like SBA, DISH's communication further stated that DISH "is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses being sold to AT&T or SpaceX, and is not entitled to receive any of the spectrum sale proceeds at closing." A true and correct copy of the letter is attached as Exhibit 3.

67.    On October 15, 2025, SBA responded to DISH's September 24, 2025 letter, rejecting DISH's assertion that its obligations under the MLA and SLAs "are excused" and demanding DISH provide adequate assurance of its intention to continue performing under the MLA and the various SLAs. A true and correct copy of the letter is attached as Exhibit 4.

68.    On October 22, 2025, DISH responded without providing any assurance. In disregard of the plain terms of Section ███ of the MLA, which foresaw the risk of FCC action and subsequent voluntary transfers of spectrum licenses to third-parties, DISH claimed that the FCC's inquiry was "entirely unforeseeable and, indeed, unprecedented," and contended that the FCC's actions "were beyond DISH Wireless's reasonable control and, thus, satisfy the criteria set forth in the Agreement's Force Majeure clause." A true and correct copy of the letter is attached as Exhibit 5.

69.    On November 10, 2025, SBA, through counsel, reiterated its position that DISH's claims of excuse were legally untenable.  A true and correct copy of the letter is attached as Exhibit 6.  DISH did not respond to SBA's November 10 letter.

70.    DISH failed to pay rent to SBA as required by the MLA and the SLAs for the period December 1, 2025 through December 31, 2025.  As of December 11, 2025, DISH owed SBA ██████████████████████████████████████████████████████████████████████ ██████  On December 11, 2025, pursuant to Section ████ of the MLA, SBA issued the First Notice of Nonpayment and Default (the "First Notice") ████████████████████████████████ ████████████████████████████████████████████████████████████  A true and correct copy of the letter is attached as Exhibit 7.

71.    On December 26, 2025, SBA, through counsel, sent a Second Notice of Nonpayment and Default in accordance with Section ████ of the MLA (the "Second Notice"), ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████  The Second Notice demanded that DISH "immediately remit payment ███████████████████████████ ████████████  and expressly reserved SBA's rights, including the right to exercise the remedies ████████████████████████████████  A true and correct copy of the letter is attached as Exhibit 8.

72.    The First and Second Notices were sent to DISH's counsel and designated notice recipients by the means specified in the MLA.  Designated notice recipients, including DISH, received the First Notice on December 12, 2025.  Designated notice recipients, including DISH, received the Second Notice on December 29, 2025.

73.    At all relevant times, SBA has continued to perform under the MLA and the SLAs.

74.    In disregard of SBA's notices, DISH continues to operate at certain sites and DISH's equipment continues to occupy space on SBA's towers and has not been removed. Removal of this equipment will be costly.

75.    DISH's failure to pay Basic Rent and other amounts properly due in ██████ ████████████████████████ constitutes a "Lessee Default."  Section ██ of the MLA provides, in relevant part:



Ex 1 - MLA § ████████████.

76.    Dish failed to cure its non-payment ████████████ and other amounts properly due on or before January 8, 2026██████████████████████

77.    For the month of January 2026, DISH has also failed to ████████████ ██████████████████████ in accordance with the MLA and the SLAs.  As of today, DISH owes SBA ████████████ ██████████████████████ ██████

78.    On January 27, 2026, SBA notified DISH of the Lessee Default and SBA's exercise of default remedies pursuant to the MLA and the SLAs.  A true and correct copy of the Notice of Lessee Default ████████ attached as Exhibit 9 (the "Lessee Default Notice").  Designated notice recipients, including DISH, have received this letter.

79.    Given the occurrence of a Lessee Default, SBA exercised its right to the following remedies: ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

80.     As of the date of the Lessee Default Notice, DISH owes ████████████

██████████████████████████ This amount does not include ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Because DISH equipment continues to occupy and/or operate at certain SBA sites, damages are continuing to accrue.

81.     DISH's only asserted grounds for nonperformance, the frustration of purpose doctrine and the force majeure clause of the MLA, have no legal basis.

82.     DISH is not excused from its obligation to perform under the frustration of purpose doctrine, which is not available when, as here, the event that allegedly prevents performance was foreseeable and was provided for under the contract.  The spectrum sales cited by DISH were multi-billion-dollar negotiated transfers undertaken on DISH's behalf by DISH's ultimate parent

and affiliates and, whether or not prompted by regulatory scrutiny or other commercial pressures, stem from voluntary business decisions by DISH and ultimately EchoStar. The risk that the FCC could seek to revoke or cancel DISH's spectrum licenses or that DISH would elect to relinquish or sell its spectrum licenses was not "unforeseeable," as DISH claimed in its October 22, 2025 letter. Ex. 5. To the contrary, these risks were foreseeable and foreseen.

83.    This risk of FCC action impacting DISH's spectrum licenses was known to DISH at the time of DISH's amendment of the MLA. DISH Network Corporation's Form 10-K for the year ending on December 31, 2019 included the following risk factors:

> Wireless services and our wireless spectrum licenses are subject to regulation by the FCC and other federal, state and local, as well as international, governmental authorities. These governmental authorities could adopt regulations or take other actions that would adversely affect our business prospects, making it more difficult and/or expensive to commercialize our wireless spectrum licenses or acquire additional licenses. . . .

> The FCC grants wireless licenses for terms of generally ten years that are subject to renewal or revocation based on certain factors depending on the license including, among others, public interest considerations, level and quality of services and/or operations provided by the licensee, frequency and duration of any interruptions or outages of services and/or operations provided by the licensee, and the extent to which service is provided to, and/or operation is provided in, rural areas and tribal lands. . . .

> Failure to comply with FCC requirements in a given license area could result in revocation of the license for that license area.[8]

84.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[8] DISH Network Corp., Annual Report (Form 10-K) (Feb. 13, 2020).

█████████ DISH's frustration of purpose doctrine improperly seeks to rewrite the Parties' MLA. Under these circumstances, DISH may not avoid its obligations under the MLA or any SLAs based on the frustration of purpose doctrine.  Ex. 2 - First Amendment § ██ (amending MLA § ███).

85.     To the extent DISH suggests that its obligations are excused because EchoStar and other affiliates, rather than DISH, will receive spectrum sale proceeds or because DISH "is not a party to the AT&T or SpaceX agreements, does not own the spectrum licenses . . . and is not entitled to receive any of the spectrum sale proceeds at closing," those are internal, self-directed corporate arrangements that do not alter DISH's independent obligations to SBA.  Ex. 3.  Any alleged frustration is voluntary and undertaken for DISH/EchoStar's own financial benefit and therefore does not excuse performance under the MLA or SLAs, nor does it constitute frustration of purpose.  The frustration of purpose doctrine cannot apply to DISH/EchoStar's foreseeable decision to sell its spectrum licenses nor can it apply to its attempt to render DISH insolvent.

86.     Nor can DISH avoid its contractual obligations by claiming a "Force Majeure" event occurred under Section █ of the MLA.  EchoStar and DISH's decision to transfer spectrum licenses to third-parties in exchange for $40 billion, whether due to pressure from the FCC, creditors or shareholders ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

87.     At all relevant times, SBA has acted in good faith and has performed its ongoing obligations under the MLA.  SBA has satisfied all requirements before commencing this action against DISH.

## CLAIM FOR RELIEF

## COUNT I

## BREACH OF CONTRACT

88.    SBA repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here.

89.    SBA and DISH are parties to the MLA and SLAs.

90.    The MLA and SLAs are valid and binding contracts between SBA and DISH.

91.    Under the MLA and SLAs, SBA granted DISH the right to access and occupy antenna and ground space at SBA-owned and operated communications sites for the installation, operation, and maintenance of DISH's wireless equipment ███████████████████████ ██████████████████████████████████████████

92.    The MLA and SLAs require DISH to make timely payments ████████████ ██████████████████████████████████████████ ███████████████████████████████████████

93.    SBA fully performed, and at all relevant times has been ready, willing, and able to perform its obligations under the MLA and SLAs, including making sites available and performing contractual services.

94.    DISH breached its payment obligations under the MLA and SLAs.  For the month of December 2025, DISH failed to pay ███████████████████████████ ██████████████████████████████████████████ ███████████████████ DISH also failed to pay █████████████████ ████ due in January 2026.

95.    DISH's nonpayment constitutes a "Lessee Default" and a material breach of the MLA and SLAs.

96.    DISH's asserted defenses of frustration of purpose and force majeure are foreclosed by the plain terms of the MLA, ████████████████████████████████████ ████████████████████████████████████████████████ Ex. 2 - First Amendment § ██ (amending MLA § █████. ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ DISH's decision to negotiate transfers of its FCC spectrum licenses was a decision within DISH's reasonable control ████████████████████████████████████████████ ██

97.    As a direct and proximate result of DISH's breaches, SBA has suffered and continues to suffer damages, ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████

### **REQUEST FOR RELIEF**

SBA requests that the Court enter an entry of judgment in its favor and against DISH, and award the following relief:

a) a judgment that DISH is in default of the MLA and SLAs, and an award of damages and other relief available under the MLA and SLAs;

b) an award of pre- and post-judgment interest;

c) an award of SBA's reasonable attorneys' fees, costs, and expenses to the fullest extent permitted by the MLA and SLAs, and applicable law; and

d) such other and further legal or equitable relief as the Court deems just and proper.

### **JURY DEMAND**

SBA hereby demands a trial by jury on all claims so triable.

Dated: February 5, 2026

      Buffalo, New York

**CONNORS LLP**

By:  *s/ Andew M. Debbins*
Andrew M. Debbins

1000 Liberty Building
424 Main Street
Buffalo, NY 14202
Telephone: (716) 852-5533
amd@connorsllp.com

**SIMPSON THACHER & BARTLETT LLP**

Michael J. Garvey *(pro hac vice forthcoming)*
David Elbaum *(pro hac vice forthcoming)*
Melissa Vallejo *(pro hac vice forthcoming)*

425 Lexington Ave
New York, NY 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
mgarvey@stblaw.com
david.elbaum@stblaw.com
melissa.vallejo@stblaw.com

*Attorneys for Plaintiffs*